Miller v. Burlington Chem. Co., 2017 NCBC 6.

| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
|---|---|
| | SUPERIOR COURT DIVISION |
| GUILFORD COUNTY | 13 CVS 9719 |

JOHN MILLER; JOHN CROSBY; and
GEORGE CLEMENTS, as Personal
Representative of the Estate of
Augustus K. Clements, III, as
members of Burlington Chemical Co.,
LLC and BCC Properties, LLC,

        Plaintiffs,

      v.

BURLINGTON CHEMICAL CO.,
LLC; BCC PROPERTIES, LLC; and
BRET HOLMES,

        Defendants.

**ORDER AND OPINION ON DEFENDANTS' MOTIONS TO DISMISS AND MOTION TO STAY**

**THIS MATTER** is before the Court on Defendants Burlington Chemical Co., LLC ("Burlington") and BCC Properties, LLC's ("BCC Properties") (collectively, the "Companies") Motion to Stay Derivative Proceeding (the "Motion to Stay"), the Companies' Motion to Dismiss, and Defendant Bret Holmes's ("Holmes") motion to dismiss (collectively, the "Motions to Dismiss") filed on September 22, 2014. The Companies and Holmes are collectively referred to herein as "Defendants." For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** the Motions to Dismiss and **DENIES** the Motion to Stay.

*Womble Carlyle Sandridge & Rice, LLP, by Brent F. Powell and Philip Mohr, for Plaintiffs John Miller, John Crosby, and George Clements.*

*Nexsen Pruet, LLC, by David S. Pokela, for Defendants Burlington Chemical Co., LLC and BCC Properties, LLC.*

*Boydoh & Hale, PLLC, by J. Scott Hale, for Defendant Bret Holmes.*

Robinson, Judge.

## I.     PROCEDURAL HISTORY

2.     The Court sets forth here only those portions of the procedural history relevant to its determination of the Motions to Dismiss and the Motion to Stay.

3.     Plaintiffs initiated this action by filing their original complaint on October 28, 2013.  This case was designated as a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina dated October 30, 2013 and assigned to the Honorable James L. Gale on the same day.  This case was reassigned to the undersigned by order dated September 9, 2016.

4.     On July 21, 2014, Plaintiffs filed an amended complaint (the "Complaint") and a Motion for Temporary Restraining Order and Preliminary Injunction (the "July 2014 Motion").

5.     Defendants filed the Motions to Dismiss, Motion to Stay, and supporting briefs on September 22, 2014.

6.     After numerous motions for extensions of time and supplemental briefing by Plaintiffs, on August 10, 2015 the Court heard oral argument on the July 2014 Motion.  After the hearing, the Court corresponded with the parties to determine whether the parties could resolve the issue on their own.  Plaintiffs' counsel requested that the Court reserve ruling on the July 2014 Motion while the parties negotiated with each other.  Ultimately, the parties were unable to resolve the issue on their own and filed supplemental briefing in April 2016.

7. On July 1, 2016, Plaintiffs filed their Motion for Mandatory Injunction (the "July 2016 Motion"). On September 27, 2016, the Court entered an Order on Plaintiffs' Motions for Mandatory Injunction (the "Mandatory Injunction Order") ordering Defendants to produce certain books and records. That same day, the Court entered a Briefing Schedule Order establishing a briefing schedule for the Motions to Dismiss and the Motion to Stay following Plaintiffs' inspection of books and records as set forth in the Mandatory Injunction Order.

8. The Motions to Dismiss and Motion to Stay have been fully briefed, and the Court held a hearing on the motions on January 17, 2017. The Motions to Dismiss and Motion to Stay are ripe for resolution.

## II. FACTUAL BACKGROUND

9. The Court does not make findings of fact on the Motions to Dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)"), but only recites those allegations of the Complaint that are relevant and necessary to the Court's determination of the Motions to Dismiss.

10. In 2007, Plaintiffs, Holmes, and two other individuals formed the Companies. (First Am. Verified Compl. and Mot. TRO and Permanent Injunctive Relief ¶ 7 [hereinafter Am. Compl.].) Burlington is a North Carolina limited liability company ("LLC") with its principal place of business in Greensboro, North Carolina. (Am. Compl. ¶ 5.) BCC Properties is a North Carolina LLC with its former principal place of business in Burlington, North Carolina. (Am. Compl. ¶ 6.) BCC Properties was dissolved on December 28, 2012. (Am. Compl. ¶ 6.)

11. Plaintiffs and Holmes are members of the Companies. (Am. Compl. ¶¶ 1–4.) At the time the Companies were formed, Holmes assured Plaintiffs that he was not and would not operate a business that competed with the Companies. (Am. Compl. ¶ 9.) Based on Holmes's representation, Plaintiffs agreed to appoint Holmes as the manager of the Companies. (Am. Compl. ¶ 9.)

12. Plaintiff John Miller owns a 25% interest in each of the Companies. (Am. Compl. ¶ 1.) Plaintiff John Crosby owns a 16.67% interest in each of the Companies. (Am. Compl. ¶ 2.) Plaintiff George Clements, as the personal representative of the estate of Augustus K. Clements, III, owns an 8.33% interest in each of the Companies. (Am. Compl. ¶ 3.) Holmes owns a 25% interest in each of the Companies. (Am. Compl. ¶ 4.) The remaining interests in each of the Companies are owned by Charles L. Moore and Bill Moorer. (Am. Compl. Ex. A [hereinafter Operating Agreement].)

13. The members of the Companies executed two substantially similar operating agreements to govern the Companies' operation and management (collectively, the "Operating Agreements"). (Am. Compl. ¶ 8.) Other than the company name on the Operating Agreements, the only difference between the Operating Agreements is the capital contributions and loan amounts each member was required to make to the Companies (the "Initial Contributions"). (Am. Compl. ¶ 8.)

14. Under the terms of the respective Operating Agreements, Holmes was required to make a capital contribution of $3,000 and a $750,000 loan to BCC

Properties, (Operating Agreement §§ 5.1–5.2), and Holmes was required to contribute by cash and/or loans a total of $112,500 to Burlington. (Am. Compl. ¶ 13.)

15.  Pursuant to the Operating Agreements, distributions to the members are based on each member's "Company Interest." (Operating Agreement § 7.1(b).) "Company Interest" is defined in the Operating Agreements as "the ratio of the Capital Contributions of the Member to the Capital Contributions of all Members." (Operating Agreement § 1.16.) "Capital Contributions" are defined as the amount of money contributed by the member pursuant to his capital contribution and loan obligations to the company. (Operating Agreement § 1.10.)

16.  Plaintiffs have made their required Initial Contributions. (Am. Compl. ¶ 11.) Plaintiffs allege that Holmes has represented to Plaintiffs that he made his required Initial Contributions, but that Holmes has failed to provide adequate documentation of his Initial Contributions upon request. (Am. Compl. ¶ 14.) Plaintiffs contend that Holmes has received various distributions based on his representation that he made the required Initial Contributions under the Operating Agreements. (Am. Compl. ¶ 23.)

17.  On December 9, 2009, the Companies closed on an asset purchase agreement (the "Asset Purchase Agreement") with Mount Vernon Chemicals L.L.C. ("Mount Vernon"). (Am. Compl. ¶ 15.) Pursuant to the Asset Purchase Agreement, Mount Vernon obtained the real property and certain enumerated assets, patents, and accounts receivable owned by the Companies. (Am. Compl. ¶ 15.)

18. Under the Asset Purchase Agreement, the estimated purchase price was $4 million. (Am. Compl. ¶ 16.) An immediate payment of $2.5 million was due at closing. (Am. Compl. ¶ 16.) Mount Vernon was to pay the remaining $1.5 million balance over the next four years (the "Four-Year Period") based on sales of certain products Mount Vernon obtained under the Asset Purchase Agreement (the "Products"). (Am. Compl. ¶ 17.) Each month, Mount Vernon was to report its monthly sales of the Products to Holmes on behalf of the Companies (the "Monthly Reports"). (Am. Compl. ¶ 17.) Mount Vernon was to then remit a certain percentage of the sales profits to Holmes (the "Monthly Payments"). (Am. Compl. ¶ 17.) The Monthly Payments were to be deducted from the $1.5 million balance owed to the Companies. (Am. Compl. ¶ 17.) At the end of the Four-Year Period, Mount Vernon was to pay the Companies the deficit, if any, between the $1.5 million balance less the Monthly Payments that had been made during the Four-Year Period (the "Shortfall Amount"). (Am. Compl. ¶ 18.) The Shortfall Amount was due on December 9, 2013 and was required to be paid no later than January 8, 2014. (Am. Compl. ¶ 18.)

19. During the Four-Year Period, Plaintiffs questioned Holmes about the Monthly Payments. (Am. Compl. ¶ 19.) Holmes assured Plaintiffs that he was keeping up with the Monthly Reports and keeping track of the Monthly Payments. (Am. Compl. ¶ 19.) Holmes expressed that Mount Vernon's sales of the Products were not as voluminous as expected, but Holmes assured Plaintiffs that any diminished Monthly Payments would be covered by the Shortfall Amount. (Am.

Compl. ¶ 19.) Plaintiffs allege that based on Holmes's statements, Plaintiffs were reasonably led to believe that Holmes was fulfilling his obligations as manager of the Companies. (Am. Compl. ¶ 20.)

20. Throughout 2012, Holmes represented to Plaintiffs that the Companies were having a successful year and indicated that a sizeable distribution would be made to the members at the annual meeting in March 2013. (Am. Compl. ¶ 24.) At the March 2013 meeting, however, Holmes announced that 2012 had not been a profitable year and no distribution would be made. (Am. Compl. ¶ 25.)

21. Plaintiffs began requesting copies of various documents from Holmes and the Companies' accountants to understand the Companies' unexpected unprofitability. (Am. Compl. ¶ 26.) As of the filing of the Complaint, Holmes had not fully provided the requested documentation. (Am. Compl. ¶ 27.)

22. During their investigation, Plaintiffs discovered that Holmes was operating Gulf States International, LLC ("Gulf States"), a business similar to and a direct competitor of Burlington. (Am. Compl. ¶¶ 29, 31.) Plaintiffs allege that Holmes sold some of the Companies' inventory to Gulf States and/or was storing some of the Companies' inventory at Gulf States's location. (Am. Compl. ¶ 30.) Plaintiffs allege that "there were undoubtedly numerous business transactions consummated by Gulf States which otherwise could have been performed by the Companies." (Am. Compl. ¶ 31.) Plaintiffs requested documentation of the sale of the Companies' inventory to Gulf States and documentation that the Companies' inventory was being properly accounted for and used only for the Companies'

operations. (Am. Compl. ¶ 30.) As of the filing of the Complaint, Holmes had not provided the requested documentation. (Am. Compl. ¶ 30.)

23. Also during their investigation, Plaintiffs learned that Holmes failed to pursue an account receivable in excess of $324,000 for product sold by the Companies to VersaChem (the "VersaChem Account Receivable"). (Am. Compl. ¶ 57.) The VersaChem Account Receivable accrued from 2007 to just prior to December 2009. (Am. Compl. ¶ 58.) Holmes did not inquire about the VersaChem Account Receivable until about December 2009, at which time Holmes unilaterally determined the Companies would not pursue it. (Am. Compl. ¶¶ 58–59.)

24. On March 12, 2014, Plaintiff John Crosby made a written demand on Holmes to take all necessary steps to collect the VersaChem Account Receivable and to take appropriate actions to collect the Shortfall Amount (the "Demand Letter"). (Companies' Br. Supp. Mot. Dismiss Ex. B [hereinafter Demand Letter].)

25. Plaintiffs bring the following direct claims against Holmes: (1) inspection of books and records; (2) breach of the Operating Agreements; (3) unjust enrichment; (4) breach of fiduciary duty; (5) breach of the implied covenant of good faith and fair dealing; and (6) fraud and negligent misrepresentation. (Am. Compl. 17–22.) Plaintiffs bring the following derivative claims on behalf of the Companies against Holmes: (1) breach of the Operating Agreements; (2) breach of fiduciary duty; and (3) breach of the implied covenant of good faith and fair dealing. (Am. Compl. 24–27.) Plaintiffs also demand an accounting. (Am. Compl. 27.)

## III. LEGAL STANDARD

### A. Rule 12(b)(1)

26. A court shall dismiss the action when it appears that the court lacks subject matter jurisdiction. N.C. Gen. Stat. § 1A-1, Rule 12(h)(3). A defect in subject matter jurisdiction may be raised by a party or by the court *sua sponte*. *Conner Bros. Mach. Co. v. Rogers*, 177 N.C. App. 560, 561, 629 S.E.2d 344, 345 (2006). "A motion to dismiss for lack of subject matter jurisdiction is not viewed in the same manner as a motion to dismiss for failure to state a claim upon which relief can be granted." *Tart v. Walker*, 38 N.C. App. 500, 502, 248 S.E.2d 736, 737 (1978). A court may consider matters outside the pleadings in determining whether subject matter jurisdiction exists. *Keith v. Wallerich*, 201 N.C. App. 550, 554, 687 S.E.2d 299, 302 (2009); *Tart*, 38 N.C. App. at 502, 248 S.E.2d at 737.

### B. Rule 12(b)(6)

27. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court reviews the allegations of the Complaint in the light most favorable to plaintiff. The Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory." *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). The Court construes the Complaint liberally and accepts all allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009).

28.     Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports [the] claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the . . . claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985); *see also Jackson v. Bumgardner*, 318 N.C. 172, 175, 347 S.E.2d 743, 745 (1986).  Otherwise, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim."  *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted).

### C.     Motion to Stay

29.     "If the LLC commences an inquiry into the allegations set forth in the demand or complaint, the court may stay a derivative proceeding."  N.C. Gen. Stat. § 57D-8-02.  An inquiry into the allegations may be made pursuant to N.C. Gen. Stat. § 57D-8-03(b) or (f).  Under section 57D-8-03(b)(1), an inquiry may be made by "[a] majority vote or other approval of those persons who have the authority individually or collectively to cause the LLC to bring an action . . . and are independent."  N.C. Gen. Stat. § 57D-8-03(b)(1).  Under section 57D-8-03(b)(2), an inquiry may be made by "[a] majority vote of a committee composed of two or more independent persons appointed by a majority vote or other approval of those persons described in [§ 57D-8-03(b)(1)]."  N.C. Gen. Stat. § 57D-8-03(b)(2).

## IV. ANALYSIS

### A. Direct Claims

30.     Holmes moves to dismiss Plaintiffs' direct claims against him pursuant to Rule 12(b)(1), contending that Plaintiffs' direct claims are derivative claims of the Companies and Plaintiffs lack standing to bring direct claims against Holmes. Holmes also moves to dismiss Plaintiffs' direct claims against him pursuant to Rule 12(b)(6).

31.     "Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction." *Neuse River Found., Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 113, 574 S.E.2d 48, 51 (2002).   It is a well-settled principle of North Carolina law that shareholders of a corporation cannot pursue individual causes of action for wrongs or injuries to the corporation. *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658, 488 S.E.2d 215, 219 (1997); *Corwin v. British Am. Tobacco PLC*, No. COA15-1334, 2016 N.C. App. LEXIS 1320, at *37 (N.C. Ct. App. Dec. 20, 2016), *mot. for en banc reh'g filed*, (Jan. 4, 2017).   There are two exceptions: (1) when there is a special duty between the wrongdoer and the shareholder; and (2) when the shareholder suffered an injury separate and distinct from the injury suffered by the corporation and the other shareholders.  *Barger*, 346 N.C. at 658, 488 S.E.2d at 219; *Corwin*, 2016 N.C. App. LEXIS 1320, at *37.

32.     For the special duty exception to apply, "the duty must be one that the alleged wrongdoer owed directly to the shareholder as an individual"—a duty that was personal to the shareholders and separate and distinct from the duty owed to

the corporation. *Barger*, 346 N.C. at 659, 488 S.E.2d at 220. In *Barger*, the Supreme Court of North Carolina set forth an illustrative, non-exclusive list of situations in which a special duty may be found. Such list included when the wrongful actions of the party induced plaintiff to become a shareholder, the wrongdoer violated his fiduciary duty to the shareholder, the wrongdoer performed individualized services directly for the shareholder, and the wrongdoer undertook to advise shareholders independently of the corporation. *Id.*

33. For the special injury exception to apply, the injury must be peculiar or personal to the shareholder. *Id.* "[A] plaintiff must show that its particular injury was 'separate and distinct from the injury sustained by the other shareholders or the corporation itself.'" *Raymond James Capital Partners, L.P. v. Hayes*, 789 S.E.2d 695, 702 (N.C. Ct. App. 2016) (quoting *Barger*, 346 N.C. at 659, 488 S.E.2d at 219).

### 1. Inspection of Books and Records

34. To the extent the Motions to Dismiss seek dismissal of Plaintiffs' claim to inspect the Companies' books and records, the Motions to Dismiss are rendered moot by the Mandatory Injunction Order, which ordered Defendants to produce specific documents set forth therein. As a result, the Court denies as moot the Motions to Dismiss with respect to Plaintiffs' inspection of books and records claim.

### 2. Breach of the Operating Agreements

35. Plaintiffs contend that Holmes breached the Operating Agreements "[b]y failing and/or refusing to account for his [Initial Contributions.]" (Am. Compl. ¶ 87.)

Plaintiffs argue that they may bring a direct claim for Holmes's alleged breach under the special injury exception. (Pls.' Consolidated Br. Opp. Defs.' Mots. 8.) Plaintiffs contend that they suffered a distinct injury because "[i]f Mr. Holmes did not make the required [Initial Contributions], then Plaintiffs should have had proportionally higher membership interests and received correspondingly larger distributions." (Pls.' Consolidated Br. Opp. 8.)

36. Plaintiffs have failed to show an injury that is distinct from the injury to the Companies or the members collectively. The fact that, but for Holmes's alleged conduct, all members should have had proportionally higher membership interests and received correspondingly larger distributions reveals on its face that Plaintiffs have not suffered a unique, personal injury. *See Raymond James Capital Partners, L.P.,* 789 S.E.2d at 702 ("Plaintiff's arguments on appeal are also consistently couched in terms of injuries sustained by it and 'the shareholders.' Thus, by plaintiff's own account, it has not suffered a unique, personal injury.").

37. Further, Plaintiffs' alleged injury derives from the same injury suffered by the Companies. Plaintiffs allege that they received reduced distributions. Any reduction in distributions is directly tied to Holmes's failure to make the Initial Contributions *to the Companies. See id.* ("[P]laintiff is simply positing a distinction without a difference: plaintiff's claims for reduced payments are based upon its ownership of shares, and these claims derive from the same underlying injury suffered by the corporation itself.").

38.     Therefore, Plaintiffs have failed to allege an injury that is separate and distinct from the harm suffered by the Companies or the members collectively.

39.     Plaintiffs do not argue, and there is no reasonable basis for the Court to conclude, that Plaintiffs may bring a direct claim for breach of the Operating Agreements pursuant to the special duty exception.  In light of the foregoing, Plaintiffs' direct claim for breach of the Operating Agreements must be dismissed for lack of subject matter jurisdiction.

### 3.     Breach of Implied Covenant of Good faith and Fair Dealing

40.     "In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Governor's Club Inc. v. Governors Club Ltd. P'ship*, 152 N.C. App. 240, 251, 567 S.E.2d 781, 789 (2002) (quoting *Bicycle Transit Auth. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985)).  Plaintiffs allege that Holmes breached the implied covenant of good faith and fair dealing in the Operating Agreements, and Plaintiffs have suffered individual harm as a result because "the revenue and income which would have been generated but for Defendant Holmes'[s] acts would have necessarily flowed to Plaintiffs in the form of distributions." (Am. Compl. ¶ 106.)

41.     As the Court has concluded that Plaintiffs lack standing to sue for breach of the Operating Agreements, it follows that Plaintiffs also lack standing to sue for breach of the Operating Agreements' implied terms.  *See Suntrust Bank v. Bryant/Sutphin Props., LLC*, 222 N.C. App. 821, 833, 732 S.E.2d 594, 603 (2012).

Regardless, as discussed above, any reduced distributions are not a separate and distinct injury from that suffered by the Companies or the members collectively.

42. Plaintiffs do not argue, and there is no reasonable basis for the Court to conclude, that Plaintiffs may bring a direct claim for breach of the implied covenant of good faith and fair dealing pursuant to the special duty exception. In light of the foregoing, Plaintiffs' direct claim for breach of the implied covenant of good faith and fair dealing must be dismissed for lack of subject matter jurisdiction.

### 4. Unjust Enrichment

43. Plaintiffs allege that Holmes was unjustly enriched because he did not make the Initial Contributions and received distributions from the Companies based on his purported Initial Contributions. (Am. Compl. ¶ 90.) Further, Plaintiffs allege that Holmes was unjustly enriched because he transferred business opportunities from the Companies to his competing business, Gulf States, which resulted in sales, profits, and benefits to Holmes. (Am. Compl. ¶ 91.)

44. Plaintiffs have failed to show an injury that is distinct from the injury to the Companies or the members collectively. As discussed above, any injury suffered by Plaintiffs as a result of Holmes's failure to make the Initial Contributions is not a separate and distinct injury. Likewise, any injury suffered by Plaintiffs as a result of Holmes usurping corporate opportunities from the Companies is not a separate and distinct injury from the injury to the Companies. *See Meiselman v. Meiselman*, 309 N.C. 279, 310–11, 307 S.E.2d 551, 569 (1983) (discussing "several circumstances under which a corporate director or officer will be deemed to have

appropriated for him or herself an opportunity rightfully belonging to *the corporation*" (emphasis added)).

45. Plaintiffs do not argue, and there is no reasonable basis for the Court to conclude, that Plaintiffs may bring a direct claim for unjust enrichment pursuant to the special duty exception. In light of the foregoing, Plaintiffs' direct claim for unjust enrichment must be dismissed for lack of subject matter jurisdiction.

### 5. Fraud/Negligent Misrepresentation

46. Plaintiffs allege that "[i]mmediately prior to entering into the Operating Agreement[s], Defendant Holmes assured Plaintiffs that he did not operate and would not operate any business which competed with the Companies." (Am. Compl. ¶ 109.) Plaintiffs allege that they would not have appointed Holmes as manager of the Companies if they knew Holmes was or would be operating a competing business. Plaintiffs contend that, as manager of the Companies, Holmes was able to redirect corporate opportunities from the Companies to Gulf States. Plaintiffs argue that, as a result, they suffered a separate and distinct injury because they would have received distributions from the income generated by the corporate opportunities had Holmes not redirected such opportunities to Gulf States.

47. Plaintiffs have failed to show an injury that is distinct from the injury to the Companies or the members collectively. As discussed above, any injury suffered by Plaintiffs as a result of Holmes usurping corporate opportunities from the Companies is not a separate and distinct injury from the injury to the Companies.

48.     Plaintiffs do not argue, and there is no reasonable basis for the Court to conclude, that Plaintiffs may bring direct claims for fraud or negligent misrepresentation pursuant to the special duty exception.  In light of the foregoing, Plaintiffs' direct claims for fraud or negligent misrepresentation must be dismissed for lack of subject matter jurisdiction.

### 6.     Breach of Fiduciary Duty

49.     Plaintiffs allege that Holmes breached his fiduciary duties to Plaintiffs by failing to provide Plaintiffs with current financial information, failing to provide the Companies' books and records to Plaintiffs, failing to insure that all Initial Contributions were made and accounted for on the Companies' books and records, failing to take appropriate action to collect accounts receivable owed to the Companies, and failing or refusing to provide Plaintiffs with information concerning the Shortfall Amount.  (Am. Compl. ¶ 96.)

50.     Plaintiffs have failed to allege an injury that is separate and distinct from the harm suffered by the Companies or the members collectively.  As discussed above, any reduced distributions Plaintiffs received as a result of Holmes's failure to insure that all Initial Contributions were made and accounted for derive from the injury suffered by the Companies.  Similarly, any injury to Plaintiffs that resulted from Holmes's failure to take appropriate action to collect accounts receivable owed to the Companies is not separate and distinct from the injury to the Companies. The same is true with respect to Holmes's failure or refusal to provide Plaintiffs with information concerning the Shortfall Amount.  The Shortfall Amount and any

outstanding accounts receivable are debts owed to the Companies, not the members individually.

51. Plaintiffs contend that Holmes owed Plaintiffs a special duty under Section 13.1 of the Operating Agreements to maintain company books and records and make them available for inspection. (Pls.' Consolidated Br. Opp. 8.) Section 13.1 of the Operating Agreements provides that Holmes

> shall maintain full and accurate books of the Company, showing all receipts and expenditures, assets and liabilities, profits and losses, and all other records necessary for recording the Company's business and affairs . . . . Such books and records shall be open for the inspection and examination by any Member . . . at reasonable times at the offices of the Company upon prior written notice.

(Operating Agreement § 13.1(a).)

52. The Court cannot infer from Section 13.1 of the Operating Agreements that Holmes owed Plaintiffs a special duty distinct from the duty Holmes owed to the Companies. Although the requirements that Holmes maintain full and accurate books and that such books be available for inspection by the members arguably creates a duty that is owed to the members, such requirements equally create a duty that is owed to the Companies. "A primary purpose of the shareholder . . . inspection statutes is to permit a shareholder . . . to become adequately informed about important matters relating to the affairs of the company, and in particular, to the shareholder's investment in the corporation and to the fulfillment of the director's fiduciary duty to the corporation." *Beam v. Beam Rest Home, Inc.*, 2014 NCBC LEXIS 45, at *10 (N.C. Super. Ct. Sept. 25, 2014). Although the requirement that the Companies' books and records be open for

inspection and examination by the members conferred rights on the members, the Court cannot conclude, without more, that such a requirement created a special duty distinct from that owed to the Companies.

53. Even assuming, *arguendo*, that the Court found the allegations sufficient to find that Holmes owed Plaintiffs a special duty, Plaintiffs' direct claim for breach of fiduciary duty must nonetheless be dismissed for failure to state a claim upon which relief can be granted.

54. In order to establish a claim for breach of fiduciary duty, plaintiff must show that: (1) defendant owed plaintiff a fiduciary duty; (2) defendant breached his fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to plaintiff. *Farndale Co., LLC v. Gibellini*, 176 N.C. App. 60, 68, 628 S.E.2d 15, 20 (2006).

55. Under the North Carolina Limited Liability Company Act (the "LLC Act"), a manager of an LLC must discharge his duties in good faith, with the care of an ordinary prudent person, and in the best interests of the LLC. N.C. Gen. Stat. § 57D-3-21(b). The manager owes these fiduciary duties to the LLC, not to individual members. *Id.*; *see also Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 474, 675 S.E.2d 133, 137 (2009). Therefore, Holmes, as the manager of the Companies, does not owe fiduciary duties to Plaintiffs, who are members of the Companies.

56. Under the LLC Act, members of an LLC are like shareholders in a corporation in that members do not owe fiduciary duties to each other or the LLC, except a controlling member owes fiduciary duties to minority members. *Kaplan*,

196 N.C. App. at 473, 675 S.E.2d at 137.  Here, Holmes owns a 25% membership interest in Burlington and a 25% membership interest in BCC Properties.

57.    The Court of Appeals of North Carolina recently held "that a minority shareholder exercising actual control over a corporation may be deemed a 'controlling shareholder' with a concomitant fiduciary duty to the other shareholders." *Corwin*, 2016 N.C. App. LEXIS 1320, at *12.  Prior to *Corwin*, North Carolina courts had recognized that individual minority shareholders of a closely-held corporation who act in concert and collectively own the majority interest in the corporation may owe fiduciary duties as the controlling shareholders.  *E.g.*, *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 407, 537 S.E.2d 248, 260 (2000).  North Carolina courts had not, however, recognized that possibility in the context of an LLC.  *See Raymond James Capital Partners, L.P.*, 789 S.E.2d at 701 ("[A]n exception to [the general] rule is that a controlling shareholder owes a fiduciary duty to minority shareholders. To that end, our courts have extended special protections to minority shareholders in *closely held corporations*." (emphasis added) (internal quotations omitted) (citation omitted) (citing *Norman*, 140 N.C. App. at 407, 537 S.E.2d at 260)); *Fiske v. Kieffer*, 2016 NCBC LEXIS 22, at *10 (N.C. Super. Ct. Mar. 9, 2016) (stating that the holding in *Norman* has not been extended to minority interest owners in an LLC); *Wortman v. Hutaff*, 2013 NCBC LEXIS 47, at *22 (N.C. Super. Ct. Oct. 29, 2013) (finding that two members who each owned a 33.33% interest were minority interest owners and they "did not owe Plaintiffs fiduciary duties simply because together they owned a majority interest in

[the LLC] and could out-vote Plaintiffs"); *Blythe v. Bell*, 2013 NCBC LEXIS 17, at *14 (N.C. Super. Ct. Apr. 8, 2013) (stating that the *Norman* rule should not apply in the LLC context).

58. Assuming, without deciding, that *Corwin* extends to minority interest owners in an LLC, the allegations do not present the unique circumstances present in *Corwin*. Holmes's minority interest did not operate as a veto power over the other membership interests, and there are no specific factual allegations from which it can be inferred that Holmes exercised actual domination and control over the Companies. Therefore, the Court concludes that Holmes is not a controlling member and does not owe fiduciary duties to Plaintiffs.

59. In short, Plaintiffs have failed to adequately allege that Holmes owed Plaintiffs a special duty or that Plaintiffs have suffered a separate and distinct injury. Therefore, Plaintiffs' direct claim for breach of fiduciary duty must be dismissed for lack of subject matter jurisdiction. Moreover, Plaintiffs have failed to sufficiently allege that Holmes owed fiduciary duties to Plaintiffs to state a claim for breach of fiduciary duty.

B. Derivative Claims

60. Defendants move to dismiss Plaintiffs' derivative claims pursuant to Rule 12(b)(1), contending that Plaintiffs failed to make an adequate demand on the Companies. Defendants also move to dismiss Plaintiffs' derivative claims pursuant to Rule 12(b)(6).

61. In order to have standing to bring their derivative claims, Plaintiffs must have made a proper demand. N.C. Gen. Stat. § 57D-8-01; *Anderson v. Seascape at Holden Plantation, LLC*, 773 S.E.2d 78, 87 (N.C. Ct. App. 2015). In order for a member to bring a derivative claim on behalf of the LLC, the LLC Act requires that

> [t]he member made written demand on the LLC to take suitable action, and either (i) the LLC notified the member that the member's demand was rejected, (ii) 90 days have expired from the date the demand was made, or (iii) irreparable injury to the LLC would result by waiting for the expiration of the 90-day period.

N.C. Gen. Stat. § 57D-8-01(a)(2).

62. The Court will first address whether Plaintiffs made a proper demand on the Companies. A demand is effective if the demand is delivered to the LLC's registered agent. *Petty v. Morris*, 2014 NCBC LEXIS 67, at *18 (N.C. Super. Ct. Dec. 16, 2014). Delivery is not required to be by registered or certified mail. *Id.*

63. Here, Plaintiffs' Demand Letter was directed to Holmes at two addresses: Burlington Chemical Co., LLC, 251 Welsh Avenue, Union Springs, Alabama 36089; and Burlington Chemical Co., LLC, 8646 West Market Street, Suite 117, Greensboro, North Carolina 27409. (Demand Letter.) The subject line of the Demand Letter is "Burlington Chemical Co., LLC." (Demand Letter.) Defendants contend that because the Demand Letter was not directed to BCC Properties, Plaintiffs have not made an adequate demand on BCC Properties.

64. While the Demand Letter was not explicitly directed to BCC Properties, Holmes is the registered agent of both Burlington and BCC Properties. Moreover, according to the records of the North Carolina Secretary of State, BCC Properties'

registered office and registered mailing address are the same as that of Burlington—8646 West Market Street, Suite 116, Greensboro, North Carolina 27409. The Court notes that the Demand Letter was addressed to "Suite 117" rather than "Suite 116," which is the suite number listed on the records of the North Carolina Secretary of State as the suite address for both Burlington and BCC Properties. Notwithstanding that discrepancy, Defendants do not contend that the Demand Letter was not timely received by Holmes.

65. Thus, the Demand Letter was directed to and received by the registered agent of both Burlington and BCC Properties. Further, the Demand Letter demanded that Holmes take appropriate actions to collect the Shortfall Amount pursuant to the Asset Purchase Agreement entered into between Mount Vernon and Burlington and BCC Properties, and to take all necessary steps to collect the VersaChem Account Receivable owed to the Companies.

66. The court addressed a similar issue in *Petty v. Morris*, 2014 NCBC LEXIS 67 (N.C. Super. Ct. Dec. 16, 2014). In *Petty*, plaintiffs' demand letter was addressed to an attorney who represented three individuals who had no authority to take action on the LLC's behalf. *Id.* at *8, 20. Plaintiffs argued that the demand was properly made on the LLC because even though the letter was only addressed to the attorney, the letter made a demand on the LLC, and the letter was copied and mailed to the LLC and received by its registered agent. *Id.* at *20−21.

67. The court found plaintiffs' demand letter to be a demand on the LLC. *Id.* at *21 ("The Court is asked to follow an indirect path, rather than the clear path

that would have existed if the letter had been addressed expressly to [the LLC]. With some reluctance, the Court finds Plaintiffs' Demand Letter to be a demand on [the LLC] delivered through its registered agent.").

68. In light of the foregoing, the Court similarly finds the Demand Letter to be a demand on both Burlington and BCC Properties delivered through their registered agent.

69. The Court next addresses whether the Demand Letter properly demanded that the Companies "take suitable action." Defendants contend that "take suitable action" means a member must demand that the LLC bring an action. The Court disagrees.

70. The purpose of the demand requirement is to "allow[] the corporation the opportunity to remedy the alleged problem without resort to judicial action, or, if the problem cannot be remedied without judicial action, to allow the corporation, as the true beneficial party, the opportunity to bring suit first against the alleged wrongdoers." *Bridges v. Oates*, 167 N.C. App. 459, 467–68, 605 S.E.2d 685, 691 (2004) (quoting *Alford v. Shaw*, 72 N.C. App. 537, 540, 324 S.E.2d 878, 881 (1985), *modified and aff'd*, 320 N.C. 465, 358 S.E.2d 323 (1987)). "The demand must be made with sufficient clarity and particularity to permit the corporation . . . to assess its rights and obligations and determine what action is in the best interest of the company." *Garlock v. Hilliard*, 2000 NCBC LEXIS 6, at *9 (N.C. Super. Ct. Aug. 22, 2000).

71. Thus, while a demand on the LLC to bring a lawsuit may constitute a demand to take suitable action, a demand on the LLC to take other action may also constitute a demand to take suitable action. *See Bridges*, 167 N.C. App. at 468–69, 605 S.E.2d at 691 (concluding that plaintiffs' demand that the officers cease the actions contrary to the by-laws was a proper demand). *Compare* Del. Code Ann. tit. 6, § 18-1001 ("A member . . . may bring an action in the Court of Chancery in the right of a limited liability company to recover a judgment in its favor if managers or members with authority to do so have refused to *bring the action* . . . ." (emphasis added)), *with* N.C. Gen. Stat. §§ 55-7-42, 57D-8-01(a)(2) (requiring a shareholder or member to make a demand on the corporation or the LLC to take suitable action before bringing a derivative action).

72. Although the Court rejects Defendants' argument that "take suitable action" means "bring a lawsuit," the Court must still determine whether the Demand Letter constituted a proper demand to take suitable action so as to satisfy the demand requirement. In so doing, "the Court must compare the derivative claims asserted in a complaint against the specific demands a plaintiff has made prior to filing suit." *Garlock*, 2000 NCBC LEXIS 6, at *9.

73. Here, the Demand Letter demands that Holmes take all necessary steps to collect the $324,000 VersaChem Account Receivable, and that Holmes take appropriate actions to collect the Shortfall Amount. The Court notes that the Demand Letter complains of injuries relating to Holmes's failure to provide information to Plaintiffs, failure to provide information regarding the Companies'

transactions with Gulf States, and failure to provide records to the Companies' accountants. Such complaints and allegations of injury, however, are not demands to take suitable action. *See Wright v. Dee*, 87 Va. Cir. 148, 150 (2013) (applying the Virginia Limited Liability Company Act and concluding that plaintiffs' demand "merely contains allegations of wrongdoing, not a demand for suitable action").

74. The Court next compares each derivative claim asserted to the actions demanded in the Demand Letter to determine whether Plaintiffs have satisfied the demand requirement.

### 1. Breach of the Operating Agreements

75. Plaintiffs allege that Holmes breached the Operating Agreements by failing and refusing to account for his Initial Contributions to the Companies. The Demand Letter does not demand that Holmes take any action with respect to the Initial Contributions or the records accounting for the Initial Contributions. Therefore, Plaintiffs have failed to demand that Holmes take suitable action in regards to Plaintiffs' claim for breach of the Operating Agreements, and such claim must be dismissed for lack of subject matter jurisdiction.

### 2. Breach of Implied Covenant of Good Faith and Fair Dealing

76. Plaintiffs allege that Holmes breached the implied covenant of good faith and fair dealing in the Operating Agreements, and the Companies have suffered harm as a result because "the Companies would have received revenue and income which would have been generated but for Defendant Holmes'[s] bad acts." (Am. Compl. ¶ 145.)

77. Plaintiffs failed to make a proper demand that Holmes take suitable action with respect to Plaintiffs' claim for breach of the Operating Agreements. It follows, therefore, that Plaintiffs have also failed to make a proper demand that Holmes take suitable action with respect to Plaintiffs' claim for breach of the implied terms of the Operating Agreements. Further, Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing appears to be based on Holmes's operation of Gulf States. As discussed above, the Demand Letter fails to demand that Holmes take any action with respect to Gulf States or records of the Companies' transactions with Gulf States.

78. Therefore, the Court concludes that Plaintiffs have failed to demand that Holmes take suitable action in regards to Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing, and such claim must be dismissed for lack of subject matter jurisdiction.

### 3. Breach of Fiduciary Duty

79. Plaintiffs allege that Holmes breached his fiduciary duties to the Companies by failing to maintain accurate books and records, failing to discharge his duties, failing to insure that the Initial Contributions were made and accounted for, usurping corporate opportunities, failing to appropriately account for profits and benefits he personally derived from the use of the Companies' assets, failing to take appropriate action to collect accounts receivable owed to the Companies, and failing to maintain and provide records necessary to collect the Shortfall Amount. (Am. Compl. ¶¶ 135–36.)

80.     To the extent Plaintiffs' breach of fiduciary duty claim is based on Holmes's failure to maintain accurate books and records, failure to discharge his duties, failure to insure that the Initial Contributions were made and accounted for, usurpation of corporate opportunities, and failure to account for profits and benefits Holmes personally derived, the Demand Letter is inadequate. The Demand Letter does not demand that any action be taken with respect to proper accounting of the Companies' books and records, Holmes's duties, the Initial Contributions, Gulf States, or Holmes's alleged usurpation of opportunities of the Companies. Accordingly, Plaintiffs' breach of fiduciary duty claim must be dismissed to the extent it is based on these allegations.

81.     The Demand Letter does, however, demand that Holmes take all necessary steps to collect the VersaChem Account Receivable and that Holmes take appropriate action to collect the Shortfall Amount. Thus, to the extent Plaintiffs' breach of fiduciary duty claim is based on Holmes's failure to collect the VersaChem Account Receivable and the Shortfall Amount, the Demand Letter constitutes a proper demand to take suitable action.

82.     Consistent with the requirements of the LLC Act, Plaintiffs did not bring their derivative claims until ninety days had expired from the date of the Demand Letter. Therefore, the Court concludes that Plaintiffs have standing to bring a derivative claim for breach of fiduciary duty based on Holmes's failure to collect the VersaChem Account Receivable and the Shortfall Amount.

83. Although the Court has concluded that Plaintiffs have standing to assert their derivative claim for breach of fiduciary duty on the limited grounds discussed above, the Motions to Dismiss also seek dismissal of Plaintiffs' claims pursuant to Rule 12(b)(6). The Court concludes, however, that the allegations of the Complaint are sufficient to state a claim for breach of fiduciary duty on these grounds.

84. The Complaint sufficiently alleges that Holmes, as the manager of the Companies, owed the Companies fiduciary duties. N.C. Gen. Stat. § 57D-3-21(b); *Kaplan*, 196 N.C. App. at 474, 675 S.E.2d at 137. Further, the Complaint alleges that Holmes breached his fiduciary duties to the Companies by failing to take appropriate action to collect the VersaChem Account Receivable and the Shortfall Amount, which caused financial loss to the Companies. (Am. Compl. ¶¶ 61, 100.)

85. Therefore, the Court concludes that the allegations of the Complaint are sufficient to state a claim for breach of fiduciary duty based on the VersaChem Account Receivable and the Shortfall Amount.

## C. Accounting

86. Based on Holmes's breach of fiduciary duties, Plaintiffs request that the Court order Defendants to provide a full and complete accounting of the Companies' financial records from 2007 to the present. (Am. Compl. ¶ 149.) At the hearing on the Motions, the Court inquired of Plaintiffs as to what they sought from an accounting that they could not obtain pursuant to their inspection request. In response to the Court's inquiry, counsel for Plaintiffs stated that an accounting would require gathering and reconciling various information. Defendants argue

that Plaintiffs are not entitled to an accounting because Plaintiffs can obtain the information through discovery.

87. "The remedy of an equitable accounting may be available when a plaintiff has asserted a valid claim for relief in equity and an accounting is necessary to compel discovery of information regarding accounts held exclusively by the defendant." *Mkt. Choice, Inc. v. New Eng. Coffee Co.*, 5:08-CV-90, 2009 U.S. Dist. LEXIS 73627, at \*35–36 (W.D.N.C. Aug. 18, 2009) (applying North Carolina law). In *Market Choice, Inc.*, the federal district court dismissed plaintiff's accounting claim because plaintiff failed to state a claim for unjust enrichment to support its accounting demand, and plaintiff had an adequate remedy under the Federal Rules of Civil Procedure for discovery of information. *Id.* at \*36–37. Similarly, in *Toomer v. Branch Banking and Trust Co.*, 171 N.C. App. 58, 70, 614 S.E.2d 328, 337 (2005), the court dismissed plaintiffs' claim for an accounting, concluding that because the underlying claims failed, the remedy of an accounting was also unavailable.

88. Here, the Court has concluded that the allegations of the Complaint are sufficient to state a derivative claim for breach of fiduciary duty against Holmes. While the Court may ultimately conclude that Plaintiffs are not entitled to an accounting, the Court cannot conclude, at the motion to dismiss stage, that the allegations of the Complaint are insufficient to state a claim for an accounting. Therefore, the Motions to Dismiss as to the accounting claim are denied.

D.    Motion to Stay

89.    The Motion to Stay requests that the Court stay the derivative proceeding while the Companies commence an inquiry into the allegations of the Complaint. Pursuant to N.C. Gen. Stat. § 57D-8-02, the Court may stay a derivative proceeding if the LLC commences an inquiry into the allegations set forth in the complaint.

90.    Defendants have failed to come forward with any record evidence that, either individually or collectively, they have taken any action to begin an inquiry into Plaintiffs' allegations.

91.    In light of the fact that the Complaint was filed two and one-half years ago, and the absence of any evidence of affirmative actions by Defendant to begin an inquiry, the Court, in the exercise of its discretion, denies the Motion to Stay.

## V.    CONCLUSION

92.    Pursuant to the foregoing, the Court hereby **DENIES** the Motion to Stay. The Court hereby **GRANTS IN PART** and **DENIES IN PART** the Motions to Dismiss as follows:

A.    The Motions to Dismiss as to Plaintiffs' inspection of books and records claim are **DENIED AS MOOT**.

B.    The Motions to Dismiss as to Plaintiffs' direct claims are **GRANTED**.

C.    The Motions to Dismiss as to Plaintiffs' derivative claims for breach of the Operating Agreements and breach of the implied covenant of good faith and fair dealing are **GRANTED**.

D.    The Motions to Dismiss as to Plaintiffs' derivative claim for breach of fiduciary duty are **GRANTED in part** and **DENIED in part** as provided herein.

E.    The Motions to Dismiss as to Plaintiffs' demand for an accounting are **DENIED**.

**SO ORDERED**, this the 27th day of January, 2017.


/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
 for Complex Business Cases