Oliver v. Brown & Morrison, Ltd., 2022 NCBC 13.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 6678

PERRY L. OLIVER,

     Plaintiff,

v.

BROWN & MORRISON, LTD., a
North Carolina Business
Corporation, and TIMOTHY J.
MARKS, as President and Sole
Shareholder of BROWN &
MORRISON, LTD., and
individually, SARA LYNN LITTLE,
CPA, PLLC, a North Carolina
Professional Limited Liability
Company, and EARLE HILTON
"PETE" WARD, CPA, individually,

     Defendants.

**ORDER AND OPINION ON
BROWN & MORRISON, LTD.'S AND
TIMOTHY J. MARKS'S RULE 12(b)(6)
MOTION TO DISMISS**

1.     **THIS MATTER** is before the Court upon the 3 July 2021 filing of Defendants Brown & Morrison, Ltd.'s and Timothy J. Marks's Rule 12(b)(6) Motion to Dismiss (the "Motion"). (ECF No. 19 ["Mot."].) The Motion seeks to dismiss all claims brought against Defendants Brown & Morrison, Ltd. ("B&M") and Timothy J. Marks ("Marks") (collectively referred to as the "Moving Defendants") in Plaintiff Perry L. Oliver's ("Oliver") Complaint. (ECF No. 3 ["Compl."].)

2.     For the reasons set forth herein, the Court hereby **GRANTS IN PART** and **DENIES IN PART** the Motion.

*Lake Norman Law Firm, by Rick Ruffin, for Plaintiff Perry L. Oliver.*

*Erwin, Bishop, Capitano & Moss, P.A., by Anthony Todd Capitano and Erin Christine Huegel, for Defendants Brown & Morrison, Ltd. and Timothy J. Marks.*

*Sharpless McClearn Lester Duffy, PA, by Frederick K. Sharpless, for Defendants Sara Lynn Little, CPA, PLLC, and Earle Hilton "Pete" Ward, CPA.*

Robinson, Judge.

## I.     INTRODUCTION

3.     The Complaint includes six separate purported causes of action.  Moving Defendants seek to have dismissed the following claims for relief alleged by Oliver in his Complaint: (1) First Claim for Relief (Breach of Contract), brought against both B&M and Marks; (2) Second Claim for Relief (Mutual Mistake), brought against B&M only; (3) Third Claim for Relief (Negligent Misrepresentation), brought against B&M only; (4) Fourth Claim for Relief (Constructive Fraud), brought against both B&M and Marks; and (5) Sixth Claim for Relief (Unjust Enrichment), brought against Marks only.[1]

## II.     FACTUAL BACKGROUND

4.     The Court does not make findings of fact on the Motion, but recites only those facts that are relevant and necessary to the Court's determination of the Motion.

---

[1] The Court's consideration of the validity of the Fifth Claim for Relief (Negligence) is intentionally omitted from this Opinion as that claim was brought only against Defendants Sara Lynn Little, CPA, PLLC, a North Carolina Professional Limited Liability Company, ("Little"), and Earle Hilton "Pete" Ward, CPA, ("Ward").  A separate Motion to Dismiss is pending filed by Little and Ward which will be the subject of a separate opinion that is forthcoming.  (*See* Mot. Dismiss Defs. Little and Ward, ECF No. 13.)

5. B&M is a North Carolina corporation. (Compl. ¶ 2.) B&M operates as a distributor and manufacturer's representative providing engineering solutions by offering process equipment products and services for industrial applications. (Compl. ¶ 17.)

6. Oliver joined B&M on 1 January 2015 pursuant to the terms and conditions of a Memorandum of Understanding and Stock Offer (the "Memorandum"). (Compl. ¶ 15.)

7. The Memorandum, which was allegedly prepared by Defendant Marks, referred to the Brown & Morrison, Ltd. Stock Partner Agreement and indicated that a new agreement would need to be executed effective 1 January 2015, between Doug Jackson ("Jackson"), the former president of B&M, Oliver, and Marks. (Compl. ¶¶ 15, 18, 19.)

8. However, in the Complaint, Oliver states the Stock Partner Agreement was in reality a stock *purchase* agreement which outlined B&M's share ownership, stock transfer restrictions, terms and conditions for stock transactions, and the formula for calculating the "Per-Share Purchase Price." (Compl. ¶¶ 20–21.)

9. B&M utilizes the Accrual-Accounting Method for financial reporting. (Compl. ¶ 32.)

10. At the time of his dealings with B&M, Oliver owned all the stock of a North Carolina corporation—Chapman Associates, Inc. ("Chapman").

11. On 1 January 2015, Oliver purchased a one-third undivided interest in B&M through the purchase of 100 shares of B&M common, no-par stock, and he

signed a $100,000.00 Promissory Note payable to B&M for the excess consideration offered by B&M for Oliver's purchase of B&M Stock and the tendering of assets from Chapman. (Compl. ¶¶ 33, 35.)

12. B&M and Chapman sales were either direct sales of products B&M had purchased for resale, or indirect sales through product manufacturers for which commissions were earned by B&M or Chapman. (Compl. ¶ 38.) At B&M, the commissions earned from indirect sales through product manufacturers are known as "Open-Rep Commissions." (Compl. ¶ 39.)

13. After becoming a shareholder in B&M, Oliver discovered that not all Accounts Receivables or Commissions Receivables were being included in the accrual-based accounting records at B&M. (Compl. ¶ 46.)

14. Oliver alleges that the failure to account for Open-Rep Commissions Receivables by B&M resulted in an understatement of the company's value. (Compl. ¶ 51.)

15. Oliver alleges that Defendants Little and Ward were aware of and complicit in these accounting practices. (Compl. ¶¶ 6, 10, 52, 76, 77, 79.)

16. Little provides professional accounting and tax-related services to B&M. (Compl. ¶ 8.) Ward has been employed by or associated with Little and served in a fiduciary capacity as the outside accounting, tax reporting contact, and advisor between Little and B&M at all times relevant to this matter. (Compl. ¶ 12.)

17. Upon discovering the failure to properly account for Open-Rep Commissions, Oliver immediately requested the inclusion of Open-Rep Commissions

Receivables in B&M's reported financial information, particularly because internal practices were not accurately tracking this information. (Compl. ¶¶ 55, 61.)

18. Oliver claims that "Open-Rep Commissions Receivables were a material portion of the overall B&M value." (Compl. ¶ 63.)

19. Therefore, the exclusion of the Open-Rep Commissions Receivables in the financial statements prepared using the Accrual-Accounting Method by B&M allegedly resulted in both an understatement of company assets, net worth, and Per-Share Purchase Price of company stock. (Compl. ¶ 87.)

20. On or about 1 January 2019, Jackson sold his 100 shares of B&M stock back to B&M. (Compl. ¶ 88.)

21. On or about 8 March 2019, Jackson submitted his letter of resignation from B&M to be effective as of 30 March 2019. (Compl. ¶ 93.) However, per Oliver's Complaint, the "Due On A Specific Date Promissory Note" issued by B&M to Jackson for the repurchase of Jackson's stock was backdated to 1 January 2019. (Compl. ¶ 94.)

22. Oliver alleges that the "Per-Share Purchase Price Formula" used for calculating Jackson's stock value referenced the use of "Accrual basis Net Worth as of 12/31/2018" as the starting basis. (Compl. ¶ 96.)

23. This transaction left Marks and Oliver as the only remaining B&M shareholders as of 1 January 2019. (Compl. ¶ 97.) Marks then assumed the position of president of B&M. (Compl. ¶ 98.)

24. In August 2019, Oliver emailed his outside CPA, Shannon Earp ("Earp"), copies of B&M tax returns for her review and possible recommendations to reduce the taxes being paid by B&M shareholders. (Compl. ¶ 101.) Oliver copied Marks and Vickie Stamey ("Stamey"), B&M's Controller, on the email. (Compl. ¶ 100.)

25. Also during August 2019, Oliver emailed Ward with several tax questions relating to being a B&M shareholder. (Compl. ¶ 102.) As alleged, Ward did not respond to Oliver's emails, (Compl. ¶ 103), or return Oliver's phone calls during this time, (Compl. ¶ 104).

26. Meanwhile, Earp replied to Oliver on 30 August 2019. (Compl. ¶ 106.) Earp purportedly indicated that the amount of taxes being paid by the B&M shareholders was "absurd" and Earp was concerned about B&M not including Open-Rep Commissions Receivables in the company's financial statements. (Compl. ¶¶ 106, 108.) According to the Complaint, Earp indicated that Little and Ward's practices were not in line with good accounting practices. (Compl. ¶ 108.)

27. Oliver discussed Earp's findings and recommendations with Stamey and informed Stamey of Oliver's possible departure from B&M in light of Earp's findings and recommendations. (Compl. ¶ 111.) Oliver asked Stamey to relay Oliver's concerns to Marks. (Compl. ¶ 112.)

28. On 30 August 2019, Earp and Marks discussed Earp's findings and recommendations. (Compl. ¶ 113.)

29.    On 16 September 2019, Oliver, Marks, and Stamey held an off-site meeting to discuss Oliver's meeting with Earp, Marks's telephone discussion with Earp, and Oliver's potential resignation from B&M.  (Compl. ¶ 114.)

30.    On 24 September 2019, Marks followed up with Oliver by email for the purpose of outlining Oliver's resignation plan; Oliver allegedly reminded Marks that his resignation was not officially tendered.  (Compl. ¶¶ 115–16.)

31.    On 10 December 2019, Oliver emailed Marks, Little, Ward, Stamey, and Earp a copy of a Per-Share Purchase Price calculation that he computed for his sale of stock back to B&M based on the reported November 2019 financial statements. (Compl. ¶ 118.)  At that time, Oliver had failed to include the Open-Rep Commissions Receivables in his Per-Share Purchase Price calculation by mistake, but this oversight was later disclosed.  (Compl. ¶ 120.)  According to the Complaint, the inclusion of the Open-Rep Commissions Receivables would significantly increase the Per-Share Purchase Price to be paid to Oliver.  (Compl. ¶ 122.)

32.    The B&M "Weekly Financial Information" spreadsheet for the week of 22 December 2019 indicated Open-Rep Commissions Receivables in the amount of $1,217,516.38 that were not included on the B&M financial statements prepared according to the Accrual-Accounting Method.  (Compl. ¶ 123.)

33.    Given that Oliver held 100 shares of the 200 total outstanding shares of B&M stock, Oliver alleged that the inclusion of the Open-Rep Commissions Receivables would have resulted in a Per-Share Purchase Price increase of $6,087.58. (Compl. ¶ 124.)

34. In December 2019, Oliver attended a slew of cardiologist appointments due to personal health issues. (Compl. ¶ 125.) He was ultimately advised to undergo coronary bypass surgery. (Compl. ¶ 126.)

35. After allegedly receiving no response from Little or Ward to a 16 December 2019 follow-up email seeking a response, Oliver emailed his letter of resignation to Marks on 18 December 2019 including an effective date of resignation of 1 January 2020. (Compl. ¶¶ 127–29.)

36. On 27 December 2019, Oliver had coronary bypass surgery. (Compl. ¶ 130.)

37. On 21 February 2020, Marks emailed the Per-Share Purchase Price buyout calculation prepared by Little and Ward for Oliver's shares at a rate of $3,950.15 per share price at close of business 31 December 2019, which did not include Open-Rep Commission Receivables. (Compl. ¶¶ 134–35.)

38. During this time, Oliver recovered from surgery, and internal email communications between Oliver and Marks confirm continued debate regarding the Per-Share Purchase Price calculation. (Compl. ¶¶ 138–39.)

39. Oliver also pointed out to B&M, Little, and Ward that they failed to properly account for the Promissory Note payable to Jackson for the purchase of Jackson's stock in 2019. (Compl. ¶ 140.) Oliver alleged that the subsequent inclusion of this long-term debt reduced the net worth of B&M for the like amount of the outstanding debt and further reduced the Per-Share Purchase Price. (Compl. ¶ 142.)

40. On 21 January 2020, the first case of COVID-19 was confirmed in the U.S., and the unknowns about the coronavirus pandemic caused great concern for Oliver due to his health and business affairs facing dramatic changes. (Compl. ¶¶ 146–47.)

41. Oliver contacted Chemineer, Inc. ("Chemineer"), which was "Oliver's largest and best product prior to and during his employment with B&M," to inform them he was leaving B&M. (Compl. ¶¶ 133, 151.) Per the Complaint, Chemineer originally asked if Oliver was interested in representing it after his B&M departure; however, this "offer" was later revoked due to the pandemic's impact on the business environment. (Compl. ¶¶ 151–53.)

42. Oliver's personal tax liability for the 2019 tax year purportedly required a tax payment in excess of $66,000.00. (Compl. ¶ 155.)

43. Per the Complaint, Oliver approached Marks regarding the possibility of withdrawing his resignation and remaining with B&M, and Marks declined Oliver's offer. (Compl. ¶¶ 156–57.)

44. The stock buyout for Oliver included an initial payment of $100,000.00 upon execution of the Buyout Agreement with the balance of the calculated buyout amount being secured by a four-year note from B&M to Oliver. (Compl. ¶ 158.)

45. Oliver continued to argue his position regarding the proper calculation of the Per-Share Purchase Price, including particularly arguing to include the Open-Rep Commissions Receivables. (Compl. ¶ 160.) B&M and Marks continued to oppose Oliver's claims. (Compl. ¶ 161.)

46.    Despite his disagreement with the calculations of his Per-Share Purchase Price, due to his desperate financial situation, Oliver executed the Redemption Agreement as proposed by B&M and Marks on 22 April 2020.  (Compl. ¶ 164.)

47.    The Redemption Agreement provided for a total buyout price of $395,015.00.  (Compl. ¶ 165.)

48.    Oliver indicated that his treatment at the time of his resignation and stock sale differ dramatically from the treatment Jackson received from B&M in 2019 when Jackson sold his shares to the company.  (Compl. ¶¶ 167–78.)

49.    The Complaint alleges that, in addition to the other errors and omissions committed by Defendants regarding accounting for Open-Rep Commissions and calculating his buy-out amount, an incorrect interest rate was applied to the promissory note for his stock and his subsequent challenges to the incorrect interest rate were summarily dismissed by B&M, Marks, Little, and Ward as being incorrect. (Compl. ¶ 179.)

## III.    PROCEDURAL BACKGROUND

50.    The Court sets forth here only those portions of the procedural history relevant to its determination of the Motion.

51.    Oliver filed the Complaint in this action on 22 April 2021.

52.    Moving Defendants filed the Motion pursuant to Rule 12(b)(6) on 3 July 2021.

53.    The Motion has been fully briefed, (B&M's and Marks's Mem. Law Supp. Rule 12(b)(6) Mot. Dismiss, ECF No. 20 ["Br. Supp."]; Pl.'s Br. Resp. Def. B&M and

Marks's Mot. Dismiss, ECF No. 22 ["Resp. Br."]; and B&M's and Marks's Reply Br. Supp. Rule 12(b)(6) Mot. Dismiss ["Reply Br."]), and the Court has conducted a hearing on the Motion and heard arguments from counsel for the parties, (*See* Not. Hearing, ECF No. 30).

54. The Motion is now ripe for resolution.

## IV. LEGAL STANDARD

55. In ruling on a motion to dismiss pursuant to North Carolina Rule of Civil Procedure (the "Rules") 12(b)(6), the Court reviews the allegations in the Complaint in the light most favorable to the plaintiff. *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017). The Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670 (1987). The Court accepts all well-pleaded factual allegations in the relevant pleading as true. *See Krawiec v. Manly*, 370 N.C. 602, 606 (2018). The Court is therefore not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.,* 174 N.C. App. 266, 274 (2005) (quoting *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002)).

56. Furthermore, the Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 206 (2016) (quoting *Laster v. Francis*, 199 N.C. App. 572, 577 (2009)). The Court may consider

these attached or incorporated documents without converting the Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment. *Id*. (citing *Schlieper v. Johnson*, 195 N.C. App. 257, 261 (2009)). Moreover, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001) (citing *Robertson v. Boyd,* 88 N.C. App. 437, 441 (1988)).

57. Our Supreme Court has noted that "[i]t is well-established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.' " *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166 (2002)). This standard of review for Rule 12(b)(6) is the standard our Supreme Court "routinely uses . . . in assessing the sufficiency of complaints in the context of complex commercial litigation." *Id*. at n.7 (citing *Krawiec*, 370 N.C. at 606 and *Christenbury Eye Ctr.*, 370 N.C. at 5).

## V.    ANALYSIS

### A.    Breach of Contract

58. Moving Defendants first seek dismissal of Oliver's breach of contract claim brought against both B&M and Marks.

59. To properly plead a breach of contract claim, the claimant must allege "(1) [the] existence of a valid contract and (2) [a] breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26 (2000) (citing *Jackson v. Cal. Hardwood Co.,* 120 N.C. App. 870, 871 (1995)). Where each of these elements are alleged, "it is error to dismiss a breach of contract claim under Rule 12(b)(6)." *Woolard v. Davenport*, 166 N.C. App. 129, 134 (2004).

60. Under North Carolina law, "a valid contract requires (1) assent; (2) mutuality of obligation; and (3) definite terms." *Charlotte Motor Speedway, LLC v. Cty. of Cabarrus*, 230 N.C. App. 1, 7 (2013) (citing *Schlieper,* 195 N.C. App. at 261); *see also Elks v. N. State Ins. Co.*, 159 N.C. 619, 624 (1912) ("There is no contract unless the parties thereto assent, and they must assent to the same thing, in the same sense." (cleaned up)). Mutual assent is demonstrated by the parties through a showing of a "meeting of the minds," evincing an intent to be bound by definite terms. *Parker v. Glosson*, 182 N.C. App. 229, 232 (2007) (citing *Charles Holmes Mach. Co. v. Chalkley,* 143 N.C. 181, 183 (1906)).

61. Moving Defendants first argue in part that the Motion should be granted as to the breach of contract claim because it is unclear on the face of the Complaint what "contract" Oliver alleges was breached. (Br. Supp. 9–13.)

62. During the hearing on 19 August 2021, counsel for Oliver confirmed that, while not attached to the Complaint when filed to initiate this action, the "contract" at issue in the breach of contract claim was filed on the Court's docket at Exhibit A to the Affidavit of Perry L. Oliver ("Oliver Affidavit"). (ECF No. 32.)

63. The North Carolina Court of Appeals has stated that "a trial court's consideration of a contract which is the subject matter of an action does not expand the scope of a Rule 12(b)(6) hearing and does not create justifiable surprise in the nonmoving party." *Oberlin Capital, L.P.,* 147 N.C. App. at 60. The *Oberlin Capital* Court further stated that because "the [ ] agreement [was] the subject of [the] complaint and [was] specifically referred to in the complaint[,] . . . the trial court did not err in reviewing the [ ] agreement when ruling on the Rule 12(b)(6) motions." *Id.* at 60–61; *see also Coley v. N.C. Nat'l Bank,* 41 N.C. App. 121, 126 (1979), *Robertson v. Boyd,* 88 N.C. App. 437, 140–41 (1988), *and Brooks Distr. Co. v. Pugh,* 91 N.C. App. 715, 717–18 (1988) (stating that "a trial court's consideration of a contract which is the subject matter of the action does not expand the scope of the hearing and should not create justifiable surprise in the nonmoving party[,]" where the agreements at issue were presented by defense counsel at a pretrial hearing).

64. Paragraph 181 of the Complaint refers to a contract for B&M's employment of Oliver and for issuance of stock ownership to Oliver in accordance with the B&M Stock Partner Agreement. It appears to the Court that this paragraph of the Complaint refers to the same contract attached as Exhibit A to the Oliver Affidavit, which describes Oliver's role as a Shareholder in B&M and provides a Per-Share Purchase Price Formula, referring to Paragraph 6 of the Buy-Sell Agreement. Therefore, the Court may properly review the contract attached to the Oliver Affidavit and considers it herein as the contract that Oliver alleges was breached.

65. Second, Defendants seek to dismiss the breach of contract claim because, "[e]ven assuming a prior '[c]ontract' existed providing for redemption of Oliver's shares on terms different from those in the Redemption Agreement, the Redemption Agreement constitutes a novation of any such prior agreement." (Br. Supp. 13.)

66. "Novation may be defined as a substitution of a new contract or obligation for an old one which is thereby extinguished[.] . . . [N]ovation implies the extinguishment of one obligation by the substitution of another." *Bowles v. BCJ Trucking Servs., Inc.*, 172 N.C. App. 149, 153–54 (2005) (some alterations in original) (quoting *Tomberlin v. Long*, 250 N.C. 640, 644 (1959)). The general requirements for a novation are: "a previous valid obligation, the agreement of all the parties to the new contract, the extinguishment of the old contract, and the validity of the new contract," and, "to constitute a novation the transaction must have been so intended by the parties." *Anthony Marano Co. v. Jones*, 165 N.C. App. 266, 269 (2004) (quoting *Tomberlin*, 250 N.C. at 644).

67. Here, it is not clear to the Court based on the facts alleged in the Complaint, as opposed to any position argued by Defendants, which is, by definition "outside the complaint," that there was an intent by all the parties—including Oliver—that the second contract (the Redemption Agreement) be substituted for the original contract (the Stock Partner Agreement). Further, the Redemption Agreement itself does not express an intent by all the parties, including Oliver, that it was meant to be substituted for the Stock Partner Agreement.

68.    The Redemption Agreement referred to in the Complaint was filed with the Court by Marks as Exhibit A to his Affidavit.  (ECF No. 18.)  On a Rule 12(b)(6) motion, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant."  *Oberlin Capital, L.P.*, 147 N.C. App. at 60 (citing *Robertson,* 88 N.C. App. at 441).  The Redemption Agreement is mentioned multiple times in Oliver's Complaint, (*see, e.g.,* Compl. ¶¶ 163–65), and, therefore, it is proper to consider the Redemption Agreement although it was presented by Marks.

69.    Oliver has properly alleged the facts necessary to sustain, at the 12(b)(6) stage, a breach of contract claim.  The Court finds that neither the facts alleged in the Complaint nor the language within the four corners of the Redemption Agreement support Moving Defendants' contention that all parties agreed to a novation (including Oliver).  As a result, the Motion is denied as to the breach of contract claim.

B.    **Mutual Mistake**

70.    Oliver claims that the Redemption Agreement was entered into as a product of mutual mistake, entitling him to relief.  As an initial matter, Oliver does not specify in the Complaint who he seeks to bring his claim for mutual mistake against.  As Moving Defendants have pointed out, "[t]he circumstances suggest this is a claim against [B&M] alone."  (Br. Supp. 15.)  Oliver does not contest this proposition.  The Court agrees and will analyze the Motion as to the mutual mistake claim only as to B&M.  Regardless of who the claim was brought against (whether

B&M alone, both B&M and Marks, or Marks alone), the Court's determination would not vary.

71. "A mutual mistake exists when both parties to a contract proceed 'under the same misconception respecting a material fact, the terms of the agreement, or the provisions of the written instrument designed to embody such agreement.' " *Smith v. First Choice Servs.,* 158 N.C. App. 244, 249 (2003) (quoting *Sudds v. Gillian,* 152 N.C. App. 659, 662 (2002)). "A party seeking relief from a contract or deed must generally prove there was a mutual mistake by the parties. . . . That mistake must occur during the making of the contract." *Stratton v. Royal Bank of Can.,* 211 N.C. App. 78, 82 (2011).

72. Oliver alleges that the Redemption Agreement executed in April 2020 is "invalid" due to mutual mistakes in (1) the calculations of the Per-Share Purchase Price and (2) an incorrect application of the interest accrual rate on the stock redemption Promissory Note. (Compl. ¶ 193.) As a result of these alleged mistakes and the alleged invalidity of the Redemption Agreement, Oliver claims the contract is unenforceable. (Compl. ¶ 192.) Oliver contends he has suffered damages in excess of $25,000.00 due to these alleged mistakes. (Compl. ¶ 196.)

73. Moving Defendants first argue that the mutual mistake claim fails because there can be no cause of action for mutual mistake, standing alone. Indeed, generally a claim of mutual mistake comes in the form of a request for recission or reformation of a contract. *See, e.g., WNC Holdings, LLC v. Alliance Bank & Trust Co.,* 2012 NCBC LEXIS 53, at **47 (N.C. Super. Ct. Oct. 2, 2012) ("In equity, a party may seek

rescission of a contract based on the mutual mistake of the parties." (citing *Marriott Financial Serv., Inc. v. Capitol Funds, Inc.*, 288 N.C. 122, 135 (1975))); *and TAC Invs., LLC v. Rodgers,* 2020 NCBC LEXIS 143, at **10–11 (N.C. Super. Ct. Dec. 7, 2020) ("Reformation is a well-established equitable remedy used to reframe written instructions where, through mutual mistake . . . the written instrument fails to embody the parties' actual, original agreement." (citing *Metro. Prop. & Cas. Ins. Co. v. Dillard,* 126 N.C. App. 795, 798 (1997) (cleaned up))).

74.     In some instances, defendants may also attempt to assert mutual mistake as a defense to contract enforcement. *See, e.g., Paradigm Fin. Group, Inc. v. Church,* 2014 NCBC LEXIS 33, at **8–10 (N.C. Super. Ct. July 24, 2014).

75.     It is questionable whether a claim for relief for mutual mistake stands on its own, but, even assuming the Court takes Oliver's statement in the Complaint that the Redemption Agreement is "invalid" due to mutual mistake as a request for rescission of the agreement—and further viewed in light of Oliver's clarification in his Response Brief to the Motion that he seeks reformation of the Redemption Agreement, (Br. Opp'n 18)—Oliver's claim for Mutual Mistake still fails for failure to allege any "mistake."

76.     Rule 9(b) states that "[i]n all averments of . . . mistake, the circumstances constituting . . . [the] mistake shall be stated with particularity." In analyzing whether the Rule 9(b) particularity requirement had been satisfied in a claim for mistake, the North Carolina Court of Appeals stated that "[t]he mere statement that something was or was not done through error, oversight and mutual mistake is not

sufficient to satisfy the minimum requirements for seeking the revision of a contract because of mistake." *Ragsdale v. Kennedy,* 22 N.C. App. 509, 511 (1974) (*rev'd on other grounds,* 286 N.C. 130 (1974)).

77.     "The party seeking reformation [for mistake] must allege the provision that was agreed upon, the provision that was written, and that the mistake was mutual. It is not required that the pleader allege facts as to how and why the mutual mistake came about." *Huss v. Huss,* 31 N.C. App. 463, 467 (1976) (citing *Matthews v. Shamrock Van Lines, Inc.,* 264 N.C. 722 (1965) (internal citations omitted)).

78.     "[O]ur Supreme Court has long held that to satisfy Rule 9(b)'s requirements [in a fraud claim], a plaintiff must 'alleg[e the] time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations.' " *Aym Techs., LLC v. Scopia Capital Mgmt. LP*, 2021 NCBC LEXIS 29, at *21 (N.C. Super. Ct. Mar. 31, 2021) (quoting *Terry v. Terry*, 302 N.C. 77, 85 (1981)).  While this is the rule for the Rule 9(b) particularity requirement with regard to fraud, a similar rule has been applied in analyzing the Rule 9(b) particularity requirement in the mistake context.  *See Lahrmer v. Norris,* 2003 N.C. App. LEXIS 1845, at *9 (2003) (finding that the plaintiff there had failed to state a claim for mistake regarding the contents of a deed where "[t]here [was] no allegation in the complaint regarding the circumstances surrounding the signing of the deed, [nor] what anyone was told concerning the titling of the property or concerning the deed's execution[.]").

79. Here, Oliver has failed to allege any facts tending to indicate that he was mistaken as to the terms of the Redemption Agreement at the time he executed the document; in fact, quite the opposite, by Oliver's own admission, he was fully aware of the provisions in the agreement that were not in accordance with his understanding of the terms that should have been included in the contract.

80. As Moving Defendants note, Oliver was fully aware of the alleged "mistakes" when he entered into the contract, making these provisions in the contract not mistakes on the part of Oliver. (Compl. ¶¶ 55–56 (as early as January 2015 Oliver was advocating for inclusion of Open-Rep Commissions in the relevant calculations); ¶ 87 (Oliver was aware that failure to include Open-Rep Commissions affects the Per-Share Purchase Price); ¶¶ 108–14 (Oliver had his accountants advocating inclusion of Open-Rep Commissions to increase value); ¶ 118 (in December 2019 Oliver provided a proposed estimated Per-Share Purchase Price including Open-Rep Commissions).)

81. Yet, "despite Oliver's disagreement with the content and manner in which his Per-Share Purchase Price had been calculated, he executed his Redemption Agreement on April 22, 2020[.]" (Compl. ¶ 164.)

82. Based on the express statements in his Complaint, the Court can only conclude that Oliver made no mistake as to the terms of the Redemption Agreement; rather, he agreed to take less than what he had argued he was owed. Therefore, the

claim for relief for mutual mistake fails and the Motion is granted as to this claim.[2] The mutual mistake claim is dismissed with prejudice.[3]

## C.     Negligent Misrepresentation

83.     Oliver's third claim, for negligent misrepresentation, is brought against B&M only.  As a result, B&M seeks to have the claim dismissed.

84.     "It has long been held in North Carolina that 'the tort of negligent misrepresentation occurs when (1) a party justifiably relies (2) to his detriment (3) on information prepared without reasonable care (4) by one who owed the relying party a duty of care.' " *Simms v. Prudential Life Ins. Co. of Am.*, 140 N.C. App. 529, 532 (2000) (quoting *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206 (1988) (cleaned up)).  When alleging negligent misrepresentation, a plaintiff must satisfy the heightened pleading standard for fraud found in Rule 9.  N.C.G.S § 1A-1, Rule 9(b); *see also Deluca v. River Bluff Holdings II, LLC,* 2015 NCBC LEXIS 12, at **20–21 (N.C. Super. Ct. Jan. 28, 2015); *BDM Invs. v. Lenhil, Inc.,* 2012 NCBC LEXIS 7, at **56 (N.C. Super. Ct. Jan. 18, 2012); *Breedon v. Richmond Cmty. Coll.,* 171 F.R.D. 189, 198–99 (M.D.N.C. 1997).

---

[2] The Court further doubts whether Oliver has failed to allege that any of the Defendants were mistaken as to the terms of the Redemption Agreement, which would be another fatal defect in the mutual mistake claim, but the Court need not reach this issue because Oliver has failed to allege even his own mistake in entering into the Redemption Agreement.

[3] "The decision to dismiss an action with or without prejudice is in the discretion of the trial court." *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013).  The Court concludes, in the exercise of its discretion, that dismissal of the mutual mistake claim (and the negligent misrepresentation claim, see herein *infra*) should be with prejudice to Oliver's right to attempt to reassert such claim through proper factual allegations by way of a motion to amend.  The Court, based on its review of the facts found in the Complaint, finds that Oliver cannot properly allege claims for mutual mistake and negligent misrepresentation.

85.     B&M claims that Oliver cannot satisfy the "justifiable reliance" element of a negligent misrepresentation claim because he admits that he knew the true facts underlying the alleged "misrepresentation." (Br. Supp. 17–18.)  The Court agrees.

86.     *Raritan River Steel Co.* stands for the proposition that, to survive a Rule 12(b)(6) motion, a plaintiff's complaint must allege facts supporting justifiable reliance to his detriment on information prepared without reasonable care by someone who owed a duty of care to the relying party.  322 N.C. at 206.  To properly plead justifiable reliance, "a plaintiff must sufficiently allege that he made a reasonable inquiry into the misrepresentation and [ ] that he was denied the opportunity to investigate or that *he could not have learned the true facts* by exercise of reasonable diligence."  *Austin v. Regal Inv. Advisors, LLC,* 2018 NCBC LEXIS 3, at *31 (N.C. Super. Ct. Jan. 8, 2018) (quoting *Rountree v. Chowan Cty.,* 252 N.C. App. 155, 163 (2017) (emphasis added) (cleaned up)).

87.     Here, Oliver admits repeatedly in the Complaint that he knew the true facts underlying the alleged "misrepresentation." (*See, e.g.,* Compl. ¶ 164 ("Despite Oliver's disagreement with the content and manner in which his Per-Share Purchase Price had been calculated, he executed his Redemption Agreement on April 22, 2020, in order to secure the One Hundred Thousand Dollar ($100,000.00) initial stock sale payment.").)     Oliver cannot properly allege that he justifiably relied on representations made by B&M while also alleging that he knew the true facts underlying those alleged misrepresentations.

88.     Additionally, even if the Court's conclusion in this regard is in error, the Complaint further fails to allege how Oliver, with reasonable diligence, could not have discovered the true facts prior to executing the agreements in question.  This failing, too, is fatal to Oliver's claim.

89.     Therefore, because Oliver cannot satisfy the justifiable reliance element, the Motion is granted as to the claim for negligent misrepresentation and that claim is dismissed with prejudice.

**D.     Constructive Fraud**

90.     Oliver's fourth claim is brought against both B&M and Marks for constructive fraud.

91.     "[A] cause of action for constructive fraud must allege: (1) a relationship of trust and confidence; (2) that the defendant took advantage of that position of trust in order to benefit himself; and (3) that plaintiff was, as a result, injured."  *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 293 (2004).

92.     Constructive fraud and breach of fiduciary duty are similar but separate claims in North Carolina.  *Id.*  The primary difference between the two claims is that constructive fraud requires that the defendant benefit himself.  *Id.* at 294.

93.     Constructive fraud and actual fraud are also similar but separate claims.  A claim of constructive fraud "does not require the same rigorous adherence to elements as actual fraud."  *Forbis v. Neal*, 361 N.C. 519, 528 (2007).  Further, an intent to deceive on defendant's part, required in a claim for actual fraud, is not a required element for constructive fraud.  *White*, 166 N.C. App. at 294.

94.     The Motion as to the constructive fraud claim is based on Oliver's alleged failure to properly set out one of the three elements of constructive fraud, namely the first element, a relationship of trust and confidence. Moving Defendants' argument for dismissal of the constructive fraud claim fails. Here, Oliver has properly pled a constructive fraud claim sufficient to withstand the Motion by alleging sufficient information to support the contention that Oliver's injury was unique such that Oliver can maintain a direct action as a shareholder.

95.     " '[T]o maintain a claim for constructive fraud, plaintiffs must show that they and defendants were in a relation of trust and confidence[.]' . . . 'Put simply, a plaintiff must show (1) the existence of a fiduciary duty, and (2) a breach of that duty.' " *Brissett v. First Mt. Vernon Indus. Loan Ass'n,* 233 N.C. App. 241, 252 (2014) (quoting *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 666 (1997), and *Keener Lumber Co., Inc. v. Perry*, 149 N.C. App. 19, 28 (2002) (cleaned up)).

96.     Generally, such a relationship exists "wherever confidence on one side results in superiority and influence on the other; where a special confidence is reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence." *White*, 166 N.C. App. at 293 (quoting *Vail v. Vail*, 233 N.C. 109, 114 (1951)); *see also Abbitt v. Gregory*, 201 N.C. 577, 598 (1931). These types of relationships generally include a patient and physician, an attorney and client, a broker and principal, a guardian and ward, and other such fiduciary relations. *Black v. Littlejohn*, 312 N.C. 626, 646 (1985); *White*, 166 N.C. App. at 293.

97.     Oliver alleges that a relationship of trust and confidence existed between him, as a corporate officer and shareholder of B&M, on the one hand, and B&M, on the other, (Compl. ¶ 212), and between Oliver and Marks as equal shareholders of B&M, (Compl. ¶ 213).  Oliver further contends that Marks, as B&M's president, owed Oliver fiduciary duties as a shareholder and that B&M, as a corporation, owed fiduciary duties to Oliver as a shareholder.  (Compl. ¶ 222.)

98.     A corporation does not owe a generalized *de jure* fiduciary duty to an officer and shareholder.  *Merrell v. Smith*, 2020 NCBC LEXIS 150, at **22 (N.C. Super. Ct. Dec. 22, 2020).  A *de facto* fiduciary duty may arise in certain situations but is a demanding standard where the party alleged to owe the duty must figuratively "hold all the cards."  *Beam v. Sunset Fin. Servs.*, 2019 NCBC LEXIS 55, at *20 (N.C. Super. Ct. Sept. 3, 2019).  Here, Oliver and Moving Defendants were on essentially equal footing.  Oliver and Marks were equal 50% shareholders in B&M and each brought business knowledge and sophistication to their respective roles, notably including Oliver's prior experience at his company, Chapman, which offered similar products and services as B&M.  (Compl. ¶¶ 34–35, 117.)

99.     Further, shareholders generally "do not owe a fiduciary duty to each other or to the corporation."  *Freese v. Smith*, 110 N.C. App. 28, 37 (1993).  There is an exception that majority shareholders owe duties to minority shareholders, but that exception is inapplicable here where Marks and Oliver were equal shareholders of B&M.  *Gaines v. Long Mfg. Co.*, 234 N.C. 340, 344 (1951); *see also Corwin*, 371 N.C.

at 616 (explaining that only controlling shareholders owe fiduciary duties to other stockholders).

100. However, to the extent that Oliver alleges that B&M and Marks—as President of B&M—were functioning in the capacity of fiduciaries to the company's shareholders, and that Moving Defendants breached that fiduciary duty as to Oliver as the only other shareholder in B&M, Oliver's allegations are sufficient to withstand the Motion based on a unique injury. (Compl. ¶ 222.)

101. As established above, a corporation does not owe generalized fiduciary duties to its shareholders. *Merrell*, 2020 NCBC LEXIS 150, at **22. Officers, however, do owe fiduciary duties to the company but not directly to its shareholders. *Raymond James Capital Partners, L.P. v. Hayes*, 248 N.C. App. 574, 577 (2016). As a result, shareholders rarely successfully bring claims in their individual capacities directly against officers of a corporation. *Id.* at 580.

102. A shareholder may only bring an individual action against a third party for an injury that directly affects the shareholder under two circumstances: (1) where the third party owed the shareholder a special duty; or (2) where the shareholder suffered a separate and distinct personal injury from the injury sustained by other shareholders or the corporation itself. *Id.* at 578. Oliver need only show that he was owed a special duty *or* that he sustained a separate and distinct injury, not both. *White v. Hyde,* 2016 NCBC LEXIS 74, at **18 (N.C. Super. Ct. Oct. 4, 2016). Here, Oliver has alleged enough to withstand the Motion by alleging that he suffered a separate and distinct personal injury.

103. The North Carolina Court of Appeals has stated that "a fifty-percent shareholder of a closely held corporation 'cannot maintain an action against defendants for her individual recovery absent a showing that she has sustained a loss peculiar to herself by reason of some special circumstances or special relationship to defendants.' " *Grasinger v. Perkins,* 2016 N.C. App. LEXIS 1040, at *9–10 (2016) (quoting *Aubin v. Susi,* 149 N.C. App. 320, 326 (2002) (cleaned up)); *see also Copeland v. Winters,* 2019 NCBC LEXIS 20, at *8–9 (N.C. Super. Ct. Mar. 18, 2019) ("The North Carolina Court of Appeals . . . has consistently held that absent extraordinary unique circumstances . . . a fifty percent owner of a corporate entity does not owe fiduciary duties to the other fifty percent owner."), *and Outen v. Mical,* 118 N.C. App. 263, 266–67 (1995) (dismissing the argument that a fifty percent shareholder relationship created a special relationship sufficient to establish individual standing).

104. To establish the unique injury, Oliver must demonstrate that he suffered a "loss peculiar to himself." *Copeland,* 2019 NCBC LEXIS 20, at *10 (quoting *Outen,* 118 N.C. App. at 266) (internal citations omitted). " 'Specifically, a plaintiff must show that its particular injury was separate and distinct from the injury sustained by the other shareholders or the corporation itself.' " *White,* 2016 NCBC LEXIS 74, at **23–24 (quoting *Raymond James Capital Partners, L.P.,* 248 N.C. App. at 581 (cleaned up)); *see also Howell v. Fisher,* 49 N.C. App. 488, 498 (1980) (stating that plaintiff may maintain an individual action where he suffered damages "distinct from any damage suffered by the corporation").

105. Here, based solely on the allegations of the Complaint, the Court concludes that Oliver has alleged sufficient facts to demonstrate that his injuries were unique from any other shareholders and from B&M. Firstly, B&M actually stood to benefit rather than be injured from the reduced Per-Share Purchase Price paid to Oliver. Secondly, Oliver alleges that his treatment at the time of his resignation and stock sale differed dramatically from the treatment Jackson, another shareholder, received from B&M in 2019 when Jackson sold his shares to the company. (Compl. ¶¶ 167–78.) Therefore, the Court finds that Oliver has done enough in the Complaint to allege that his injuries were unique based on his agreements with B&M—the Redemption Agreement and the Stock Partner Agreement—and the Per-Share Purchase Price paid by B&M for Oliver's shares.

106. Therefore, because Oliver has alleged enough to withstand the Motion by alleging a unique injury as a shareholder, and given that Marks, as the president of B&M, owed B&M a duty as its chief executive officer to properly manage the entity, the Court hereby denies Moving Defendants' motion to dismiss as to the constructive fraud claim.

E. **Unjust Enrichment**

107. The sixth claim, for unjust enrichment, is brought against Marks only. Marks seeks dismissal of this claim.

108. "A claim for unjust enrichment 'is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law.'" *Cty. of Wake*

*PDF Elec. & Supply Co., LLC v. Jacobsen*, 2020 NCBC LEXIS 103, at *28 (N.C. Super. Ct. Sept. 9, 2020) (quoting *Booe v. Shadrick*, 322 N.C. 567, 570 (1988)).

109. "The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor." *Atlantic C. L. R. Co. v. State Highway Comm'n*, 268 N.C. 92, 95–96 (1966) (citing *Beacon Homes, Inc. v. Holt*, 266 N.C. 467 (1966), and *Dean v. Mattox*, 250 N.C. 246 (1959)). "The claim is not based on a promise but is imposed by law to prevent an unjust enrichment. If there is a contract between the parties [then] the contract governs the claim and the law will not imply a contract." *Booe*, 322 N.C. at 570.

110. "In North Carolina, to recover on a claim of unjust enrichment, Plaintiff must prove: (1) that it conferred a benefit on another party; (2) that the other party consciously accepted the benefit; and (3) that the benefit was not conferred gratuitously or by an interference in the affairs of the other party." *Cty. of Wake PDF Elec. & Supply Co., LLC,* 2020 NCBC LEXIS 103, at *29 (citing *Southeastern Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330 (2002)).

111. Marks's first argument in favor of dismissal of the unjust enrichment claim is that Oliver alleges that a benefit was conferred on B&M, but the benefit only indirectly redounded to Marks as the remaining shareholder in B&M. (Br. Supp. 23–24.) This argument fails.

112. North Carolina courts as of late have routinely "held that an indirect benefit can support an unjust enrichment claim." *Lau v. Constable*, 2017 NCBC LEXIS 10,

at \*\*14 (N.C. Super. Ct. Feb. 7, 2017); *see also New Prime, Inc. v. Harris Transp. Co.,* 222 N.C. App. 317 (2012); *Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.,* 72 F. App'x 916, 921 (4th Cir. 2003).

113. Marks's only other argument in favor of dismissal of the unjust enrichment claim is that it must fail because it was not expressly pled "in the alternative" to the claims based on the existence of an express contract. (Br. Supp. 24–25.) This argument for dismissal meets the same fate as the first.

114. A plaintiff is not required to expressly state that the unjust enrichment claim is being pleaded "in the alternative" to another claim that is based on the existence of an express contract. *See Zagaroli v. Neill,* 2017 NCBC LEXIS 103, at \*14–15 (N.C. Super. Ct. Nov. 7, 2017) ("Notwithstanding that Plaintiff ideally should have pleaded [the unjust enrichment] claim[ ] expressly in the alternative, 'under certain facts a plaintiff is not required to identify alternatively pleaded claims expressly as such, because [Rule] 8(e)(2) does not mandate a particular form for phrasing alternative claims.' " (quoting *Kingsdown, Inc. v. Hinshaw*, 2016 NCBC LEXIS 15, at \*29 n.9 (N.C. Super. Ct. Feb. 17, 2016) (some alterations in original))); *see also Bandy v. Gibson,* 2017 NCBC LEXIS 66, at \*12 (N.C. Super. Ct. July 26, 2017) ("The Court is unwilling to prevent [plaintiff's] unjust enrichment claim from moving to discovery because it was not specifically pleaded in the alternative to her breach of contract claim."); *Oxendine v. Bowers,* 100 N.C. App. 712, 716 (1990) (Rule 8(e)(2) does not "provide[ ] for any particular form of phrasing alternative claims.").

115. The Court finds that Marks's arguments for dismissal of the unjust enrichment claim are unavailing. Therefore, the Motion is denied as to the claim for unjust enrichment.

## VI. CONCLUSION

116. For the foregoing reasons, the Court hereby **GRANTS IN PART** and **DENIES IN PART** the Motion as follows:

a. the Motion is DENIED as to the breach of contract claim;

b. the Motion is GRANTED as to the mutual mistake claim and that claim is DISMISSED WITH PREJUDICE;

c. the Motion is GRANTED as to the negligent misrepresentation claim and that claim is DISMISSED WITH PREJUDICE;

d. the Motion is DENIED as to the constructive fraud claim; and

e. the Motion is DENIED as to the unjust enrichment claim.

**IT IS SO ORDERED**, this the 3rd day of March, 2022.


/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
 for Complex Business Cases